<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ERIC KELLEY,

       Petitioner,

v.

ROY L. HENDRICKS, et. al.

       Respondent(s).

Civ. No. 03-4780 (WGB)

<u>O P I N I O N</u>

<u>Appearances</u>

Eric Kelley, #280249
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

      Pro Se Petitioner

James F. Avigliano, Esq.
Passaic County Prosecutor
By:  Steven E. Braun
     Chief Assistant Prosecutor
Administration Building
401 Grand Street
Paterson, NJ 07505-2095

      Attorney for Respondent(s)

**BASSLER, SENIOR DISTRICT JUDGE:**

Petitioner, Eric Kelley ("Petitioner"), a state prisoner proceeding pro se, files this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons set forth in this Opinion, Petitioner's request for habeas corpus relief is **denied.**

I.   <u>BACKGROUND</u>

On the morning of July 28, 1993, Tito Dante Marino ("Tito") was working as a clerk at Victoria's Video, a video rental store located at 432 Union Avenue in Paterson, New Jersey.  The store was owned by Tito's uncle, Miguel Victoria, who also was working at the store on that date.

At around noon, Mr. Victoria left the store to make some purchases elsewhere, leaving Tito alone in the store.  At around 1:45 p.m., Mr. Victoria's sister discovered that Tito was in the back room lying on the floor, with blood all around him.  A doctor at the scene informed the first officer to arrive that Tito was dead.  The medical examiner determined that the cause of death was numerous stab wounds to the abdomen, chest, and lung, and that there was blunt force trauma to the head as well.  About $150 in cash, a VCR, and some other items were missing from the store.

During its investigation, the police discovered Carmen Paredes and Majdi Mousa.  Mr. Mousa was at the store at around

2

1:30 p.m. to return a video.  He saw a black male in his mid-twenties come out from the back room of the store.  The man told Mr. Mousa to put the video on the table and leave.  Mr. Mousa observed that the man had blood dripping from his ear, bloody scratches on his right arm, and that he was "acting nervous." Ms. Paredes had come to the store around 1:20 p.m., and almost bumped into a black male at the entrance.  She later identified this person from a photo array as Ralph Lee.

On July 30th, Detective Richard Reyes, acting on a confidential informant's tip, observed a black male that fit the description given by Mr. Mousa walking towards fellow police officers.  The man slowed his gait and crossed the street when he saw the officers.  They told him about their investigation of the murder of Tito Merino.  He identified himself as Eric Kelley, and agreed to accompany the officers to the police station.  Upon being asked whether he would volunteer his whereabouts on the day Tito was murdered, Petitioner said yes, and asserted that he was cashing a check for his mother at the time.  When told the police were about to verify his story, Petitioner admitted he was not being truthful, and his demeanor suddenly changed.

Detective Reyes then placed Petitioner under arrest and advised Petitioner of his <u>Miranda</u>[1] rights.  Petitioner indicated he understood those rights and that he wished to waive them, and

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3

he executed a form stating as much.  He then confessed to the murder of Tito Merino in a written statement, and inculpated his accomplices Ralph Lee and David Hancock as well.   In the statement Petitioner stated that Hancock stayed outside the store to serve as a lookout, that Petitioner stabbed Tito while Lee hit him on the head, that Petitioner discarded the knife, and that the three men sold most of the stolen items to purchase drugs. Petitioner also admitted owning a plaid green and purple cap found at the scene, which Ms. Paredes had identified as the one being worn backwards by the man she had seen in the video store, Ralph Lee.

While at the police station, Petitioner said to David Hancock, who had voluntarily come to the station, "Man, just give it up."  Additionally, Dennis Williams, who is acquainted with Petitioner, testified that around 2:00 p.m. on July 28th (the day of the homicide), he heard Petitioner say, "Why we kill that man? Why we kill that man for diesel [i.e. for drugs]?"

II.   DISCUSSION

A.   Procedural History

Tried to a jury, Petitioner was convicted on February 6, 1996, under New Jersey statutes N.J.S.A. 2C:11-3a(3), 2C:15-1, 2C:5-2, 2C:39-4d, and 2C:39-5d, of felony murder, robbery, and weapons offenses.  State v. Kelley, A-6508-00T4, at 2 (N.J. Super. Ct. App. Div. Oct 10, 2002).  He was sentenced to life

4

imprisonment, with a thirty-year parole disqualifier.  Id.
Petitioner appealed the judgment of conviction, on grounds that
the trial court committed plain error in (1) admitting hearsay
evidence; (2) failing to give a limiting instruction regarding
other crime testimony; and (3) omitting a charge on
identification evidence.  Id. at 2-3.  The Superior Court of New
Jersey, Appellate Division, finding no sound basis to reverse
Petitioner's conviction, affirmed on June 5, 1998, and the New
Jersey Supreme Court denied certification.  State v. Kelley, 157
N.J. 545 (1998).

Petitioner then sought post-conviction relief, arguing (1)
denial of a right to fair trial due to the prosecutor's
inflammatory remarks; and (2) denial of effective assistance of
trial and appellate counsel.  His petition was denied on December
11, 2000, State v. Eric Kelley, Indictment No. 93-10-1183 (N.J.
Super. Ct. Law Div. Dec 11, 2000).  In his appeal to the
Appellate Division, Petitioner added two new claims: (1) that his
statement should have been excluded due to a "warrantless
arrest"; and (2) that trial counsel was ineffective for failing
to argue that Petitioner's arrest was illegal for lack of
probable cause.  The Appellate Division, agreeing with the
reasoning set forth in the post-conviction court's opinion, and
finding no merit to Petitioner's supplemental claims, affirmed
the post-conviction court's decision.  State v. Kelley, A-6508-

5

00T4 (N.J. Super. Ct. App. Div. Oct 10, 2002).  The New Jersey
Supreme Court denied certification on May 6, 2003.  Petitioner
filed this application for federal habeas relief on August 27,
2004.

 B. <u>Exhaustion of State Remedies</u>

 Persons in custody pursuant to the judgment of a state court
shall not be granted habeas corpus relief by a federal court
unless it appears that "the applicant has exhausted the remedies
available in the courts of the State."  28 U.S.C. §
2254(b)(1)(A); <u>see also</u> <u>Lambert v. Blackwell</u>, 134 F.3d 506, 513
(3d Cir. 1997).  The state courts must have the first opportunity
to hear and correct an alleged constitutional violation that
occurred in the state court system.  <u>Picard v. Connor</u>, 404 U.S.
270, 276 (1971).

 To satisfy the exhaustion requirement, a petitioner must
show that the claims he asserts in federal court have been
"fairly presented" to the state courts.  <u>Id.</u> at 275.  A claim has
been "fairly presented" when the federal claim is the
"substantial equivalent" of that presented in the state courts.
<u>Gibson v. Scheidemantel</u>, 805 F.2d 135, 138 (3d Cir. 1986).  The
exhaustion requirement flows from principles of federalism and
comity.  <u>Lambert</u>, 134 F.3d at 513 n.18.

 Initially, the Court observes that prior to his application
for federal habeas relief, Petitioner appears to have in fact

exhausted his state remedies.  The record indicates that
Petitioner has raised each of his grounds for relief at various
points in the state proceedings (Pet'r Br. at i,ii; Def. Br. On
Appeal of Denial of Post-Conviction Review at Da 10-34),[2] whether
on direct appeal or on post-conviction review.  The record also
indicates that the state courts have been "fairly presented" with
each of these claims, in a manner "substantial[ly] equivalent" to
that presented here.[3]  Picard, 404 U.S. at 275; Gibson, 805 F.2d
at 138.  The state courts have "had the first opportunity to hear
the claim[s] sought to be vindicated in a federal habeas
proceeding."  Picard, 404 U.S. at 276.  As such, Petitioner has

---

[2] As set forth in Defendant's Brief on Appeal of Denial of
Post-Conviction Review, "Da" refers to the Appendix of that
Brief, which contains the past state court decisions in this
case.  Da 10-34 contains, among other things, the Appellate
Division denial of Petitioner's appeal of his conviction, and the
trial court's decision denying Petitioner's request for post-
conviction relief.

[3] Respondent argues that Petitioner has failed to exhaust his
state remedies because he presents his "involuntary statement"
claim for the first time in this petition.  While understandable
given the lack of clarity in Petitioner's papers, the Court
interprets Petitioner's "involuntary statement" claim presented
here to be substantially equivalent to the "warrantless arrest"
claim in his Supplemental Brief appealing denial of post-
conviction relief at the Appellate Division, given that his
arguments in the Supplemental Brief address involuntariness
(e.g., that he "was arrested without probable cause...[and] the
statement was...involuntarily given."  (Pet'r Supp. Br. at 3,4.)
As such, the Court will consider Petitioner's "involuntary
statement" claim to have already been fairly presented to the
state courts.

met his exhaustion burden, and his petition is properly before this Court.

Even if Petitioner's claims are not totally exhausted at the state level, this Court would still have the power to deny habeas relief.  While it is true that, under the exhaustion doctrine, federal courts can only grant habeas petitions after those claims have first been totally exhausted at the state level, Lambert, 134 F.3d at 513, federal courts are not barred from *denying* habeas petitions on the merits.  Section 2254(b)(2), as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), codifies the power of federal courts to exercise their discretion and deny habeas petitions on the merits, "notwithstanding the failure of the applicant to exhaust [State remedies]."  28 U.S.C. § 2254(b)(2).  This relaxation of the strict "total exhaustion" requirement avoids useless and wasteful state court litigation where a petition is clearly without merit.  Granberry v. Greer, 481 U.S. 129 (1987); Hoxsie v. Kerby, 108 F.3d 1239, 1242-43 (10th Cir. 1997).

Because § 2254(b)(2) does not provide a standard for determining when a federal habeas court should dismiss on the merits instead of requiring total exhaustion, the Third Circuit reads the statute in conjunction with the Supreme Court's holding in Granberry.  Lambert, 134 F.3d at 514.  Under this approach, a petition should be denied when it is "perfectly clear that the

8

applicant does not raise even a colorable federal claim." <u>Id.</u> at 515 (quoting <u>Granberry</u>, 481 U.S. at 135).  As will be shown below, this standard has clearly been met in this case. Accordingly, even in the absence of exhaustion, this Court is within its bounds in reaching the merits and denying habeas relief.

    C.   <u>Standard of Review</u>

Federal courts have the power to entertain habeas corpus applications by persons in custody pursuant to the judgment of a State court and who claim that they "[are] in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

In addition, 28 U.S.C. § 2254(d), as amended by AEDPA, precludes federal habeas relief on any claim adjudicated on the merits in state court, <u>unless</u> the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the Third Circuit's interpretation in <u>Matteo v. Superintendent, SCF Albion</u>, 171 F.3d 877 (3d Cir. 1999), §

2254(d)(1) requires a two-step inquiry.  First, a federal habeas court must determine whether the state court decision was "contrary to" a Supreme Court precedent that resolves the petitioner's claim.  Id. at 888.  A claim will be considered "contrary to" Supreme Court precedent if the state court has reached a "conclusion opposite to that reached by th[e] [Supreme] Court on a question of law, or if the state court decides a case differently than th[e] [Supreme] Court has on a set of materially indistinguishable facts."  Marshall v. Hendricks, 307 F.3d 36, 51 (3d Cir. 2002) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  To obtain relief on these grounds, the petitioner must show that Supreme Court precedent "requires the contrary outcome."  Matteo, 171 F.3d at 888 (emphasis in original); see also O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998).  "This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent."  Matteo, 171 F.3d at 888.  Only if the Supreme Court has not articulated a rule specific enough to trigger "contrary to" review can a federal habeas court proceed to the second step.  Matteo, 171 F.3d at 888.

Under the second Matteo step, the court must determine whether the state court decision was based on an "unreasonable application of" Supreme Court precedent.  Id. at 889.  The appropriate question is whether the state court's application of

10

Supreme Court precedent was "objectively reasonable." Id.
"[T]he 'unreasonable application' clause does not empower a
habeas court to grant the writ merely because it disagrees with
the state court's decision." Id. (quoting O'Brien, 145 F.3d at
25).

The Supreme Court maintained this deference to state courts
in Williams v. Taylor, 529 U.S. 362 (2000), holding that "[s]tate
court judgments must be upheld unless, after the closest
examination of the state-court judgment, a federal court is
firmly convinced that a federal constitutional right has been
violated." Id. at 389.

D.   Petitioner's Arguments

Petitioner appears to present four independent
constitutional grounds for why he should be granted a writ of
habeas corpus: (1) Effective Assistance of Counsel violations;
(2) Due Process violations; (3) a Probable Cause violation; and
(4) a Compulsory Process violation.  For the reasons stated
below, each of Petitioner's claims fails.

1.   Ineffective Assistance of Counsel Claims

Petitioner argues that his Sixth Amendment right to
effective assistance of counsel was violated.  (Pet'r Br. at 21.)
A claim of ineffective assistance of counsel requires the court
to determine whether counsel was both effective and competent.
Judicial scrutiny of counsel's performance must be highly

11

deferential, and the court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.  See Strickland v. Washington, 466 U.S. 668, 689 (1984).  The threshold for determining ineffective assistance of counsel is "whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result."  Id. at 686.

The Court in Strickland advanced a two-part test for evaluating the performance of counsel.  First, the petitioner must show that, after considering all of the circumstances and evidence, counsel's performance was "ineffective," as measured against the objective standard of reasonably effective assistance.  See id. at 687.  Second, the petitioner must demonstrate that counsel's performance so "prejudiced" the defense that the petitioner was deprived of a fair trial; this requires the petitioner to show with reasonable probability that the result would have been different in the absence of counsel's errors.  See id.  A petitioner must satisfy both elements of the Strickland test to establish a claim of ineffective assistance.

Petitioner claims that defense counsel was ineffective because counsel (1) failed to respond to inflammatory remarks by the prosecutor; (2) failed to seek a curative instruction for those inflammatory remarks; (3) failed to call Dannie Kelley,

12

Petitioner's mother; and (4) failed to seek a motion that the verdict was against the weight of the evidence.[4]  (Pet'r Br. at 21-27.)

Each of Petitioner's contentions is without merit and fails the Strickland test.  Initially, the Court notes the Supreme Court's admonition that "[i]n assessing the adequacy of counsel's performance, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 483 U.S. at 690.

Defense counsel's failure to respond to inflammatory remarks by the prosecutor (referring to Petitioner as a member of the "rainbow coalition of evil" and stating that such a term was "too nice a term" to characterize Petitioner) (4T 14-4 to 10)[5] was objectively reasonable, as was counsel's failure to seek curative instructions regarding the prosecutor's references to Petitioner's drug purchase on the day of the murder.  (5T 104-2 to 20.)[6]  Choosing not to respond to such remarks may have been a

---

[4] In Point 1 of his Supplemental Brief, Petitioner also argues that his counsel was ineffective for failing to challenge the probable cause of his arrest.  While styled as an ineffective assistance claim, the Court will consider this argument to be more properly presented as a due process argument.  Accordingly, this claim will be addressed later in the Opinion.

[5] For the purposes of this Opinion, the Court has adopted the transcript citation method employed by Respondent in his brief. Thus, 4T 14-4 to 10 refers to testimony given on January 24, 1996, at page 14, from lines 4 to 10.

[6] 5T refers to testimony given on January 25, 1996.

strategic decision by counsel to avoid prolonged discussion of Petitioner's character, or counsel may have thought such comments were too insignificant to warrant a response.  After affording such a strategic judgment by defense counsel the requisite "heavy measure of deference," Virgin Islands v. Weatherwax, 77 F.3d 1425, 1432 (3d Cir. 1996), the Court finds such decisions by counsel to have been objectively reasonable.

In any event, counsel's failure to respond did not sufficiently prejudice Petitioner under the second Strickland factor as to require a new trial.  As the Appellate Division found in its opinion denying post-conviction relief, counsel's decision not to object and not to request curative instructions "did not prejudice [Petitioner's] right to a fair trial, especially given the prosecutor's own exhortation to the jury to render its decision without emotion and solely on the proofs, and the trial judge's reinforcement of this principle in his instructions to the jury both before openings and after summations." State v. Kelley, A-6508-00T4 (N.J. Super. Ct. App. Div. Oct 10, 2002).  Petitioner has not shown with reasonable probability that the result in his trial would have been different in the absence of such decisions by counsel. Accordingly, the Court rejects Petitioner's first two ineffective assistance claims--that his counsel was ineffective for failing to respond to the prosecutor's remarks and for failing to seek

curative instructions for those remarks--on the grounds that those claims do not satisfy the Strickland standard.

Similarly, Petitioner's contention that his counsel was ineffective in failing to call Dannie Kelley (Petitioner's mother) to testify fails the Strickland "prejudice" requirement. Petitioner argues that his mother would have testified that Petitioner's clothes did not have blood on them, and that the absence of her testimony prejudiced the outcome. (Pet'r Br. at 25.)  Testimony as to a lack of blood on Petitioner's clothes was already adduced by Petitioner's witness William Handley (5T 87-18); as such the mother's testimony would only have served to duplicate testimony already admitted.  State v. Eric Kelley, Indictment No. 93-10-1183 (N.J. Super. Ct. Law Div. Dec 11, 2000).  Petitioner's mother may have been an unconvincing witness, or such a decision may have been dictated by a credibility question given a probable bias towards Petitioner. Regardless, such decisions fall under the strategic choices deference afforded counsel.  See Virgin Islands, 77 F.3d at 1432; see also Strickland, 483 U.S. at 690.  The Court agrees with the state courts that inclusion of Petitioner's mother's testimony would not have been enough to overcome all the other evidence presented at trial.  Thus, Petitioner has failed to show prejudice under the second Strickland factor.

Finally, Petitioner's claim that counsel was ineffective for

15

failing to file a motion that the verdict was against the weight of the evidence is meritless.  Given the State's "overwhelming evidence of guilt," State v. Eric Kelley, Indictment No. 93-10-1183 at 10 (N.J. Super. Ct. Law Div. Dec 11, 2000), including Petitioner's confession to participation in the murder, the recovery of Petitioner's hat at the scene, and his identification by various individuals, id., the Court finds unpersuasive Petitioner's argument that had counsel filed such a motion the outcome would have been different.

Petitioner also claims that appellate counsel was ineffective in failing to raise on appeal the issue of whether trial counsel was ineffective in failing to raise the arguments listed above.  (Pet'r Br. at 28.)  This argument is without merit as well.  As Respondent notes in his brief, counsel's failure to raise these issues was "clearly due to strategic determination, in exercise of appellate counsel's duty to concentrate only on viable claims of error."  (Resp't Br. at 7.)  See, e.g., Jones v. Barnes, 463 U.S. 745, 751-53 (1983).

Based on the record, the State's compelling evidence against Petitioner, and Petitioner's failure to meet the Strickland standard for each of his ineffective assistance claims, the Court rejects Petitioner's claim that counsel's performance was deficient.

2.   Due Process Claims

16

Petitioner also claims that his Fourteenth Amendment due process rights were violated, arguing that (1) he was denied a fair trial due to prosecutorial misconduct; (2) he was coerced into making an involuntary statement; and (3) his Miranda rights were violated because he was in custody and being interrogated prior to being arrested and read his rights.[7]  (Pet'r Br. at 13, 22; Pet'r Supp. Br. at 3.)  Each of these claims is without merit.

"Vindication of due process is precisely [the] historic office of habeas corpus."  Fay v. Noia, 372 U.S. 391, 402 (1963) (overruled on other grounds by Coleman v. Thompson, 501 U.S. 722 (1991)).  In the context of criminal trials, the Fifth and Fourteenth Amendments' due process requirements have been interpreted to mean that criminal prosecutions "must comport with prevailing notions of fundamental fairness."  California v. Trombetta, 467 U.S. 479 (1984).  In order to declare a denial of due process, a court must find that "the absence of fairness fatally infected the trial."  Lisenba v. California, 314 U.S. 219, 236 (1941).  "Acts complained of must be of such quality as necessarily prevents a fair trial."  Id.  Furthermore, a federal

---

[7] Petitioner also claims in Point 2 of his Supplemental Brief that his statement should have been excluded due to a "warrantless arrest."  (Pet'r Supp. Br. at 3.)  In and of itself, this claim is meritless and unsubstantiated.  To the extent that the Court can discern any actual argument set forth in Point 2, (e.g., that Petitioner's confession was coerced), the Court addresses these arguments elsewhere in the Opinion.

court may not overturn a conviction resulting from a state trial
merely because the state's action is "undesirable" or
"erroneous"; it may only do so if such action violated a
fundamental right guaranteed by the Fourteenth Amendment.  Cupp
v. Naughten, 414 U.S. 141, 146 (1973).

    In addition to arguing that his counsel was ineffective for
failing to object to the prosecutor's remarks,[8] Petitioner's
first due process claim is that those remarks[9] were so
inflammatory that in and of themselves they amounted to a denial
of due process.  (Pet'r Br. at 22.)  In order to determine
whether prosecutorial misconduct has resulted in a denial of due
process, a court must assess whether such misconduct constituted
a "failure to observe that fundamental fairness essential to the
very concept of justice."  Moore v. Morton, 255 F.3d 95, 105 (3d
Cir. 2001) (quoting Lisenba, 314 U.S. at 236).  The court must
focus on whether the conduct was egregious enough to render the
entire trial unfair.  Cook v. Bordenkircher, 602 F.2d 117 (6th
Cir. 1979).

    On such a standard, the facts here do not support
Petitioner's contention that the prosecutor's remarks resulted in
a denial of due process.  The trial court, while acknowledging

---

    [8] See Part II-D-1 of this Opinion.

    [9] As noted earlier, the prosecutor referred to Petitioner as
a member of the "rainbow coalition of evil," and said that was
"too nice a term" to describe Petitioner. (4T 14-4 to 10.)

18

that the prosecutor's remarks were improper, found that "these remarks do not address 'critical and contested' issues of fact," and that they "d[id] not mislead the jury as to the factual situation surrounding [Petitioner's] guilt or innocence." State v. Eric Kelley, Indictment No. 93-10-1183 (N.J. Super. Ct. Law Div. Dec 11, 2000). The trial judge also found that in the context of the entire trial, the comments were "of minimal moment." Id. Furthermore, as noted earlier, any hint of prejudice from such comments was effectively rectified by the prosecutor's own instruction to the jury to base its decision solely on the evidence, and by the trial judge's reinforcement of this instruction. Given these facts and findings, the Court rejects Petitioner's claim that the prosecutor's remarks denied him due process.

Petitioner's second due process claim--that his confession to the police was involuntary--is similarly without merit. The Supreme Court, in due process jurisprudence that "[has] never [been] abandoned," Dickerson v. U.S., 530 U.S. 428, 434 (2000), has found the "voluntariness" due process inquiry to be one that examines "whether a defendant's will was overborne." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Id.

19

It is true that the "coercion inherent in custodial interrogations blurs the line between voluntary and involuntary statements." Dickerson, 530 U.S. at 435.  Certain facts in this case support this proposition, e.g., that the detectives asked Petitioner for his alibi for the day of the murder and attempted to verify that alibi, while at the police station, in the presence of numerous police officers.

However, the record indicates that Petitioner's confession was made voluntarily and without coercion.  The trial judge found that Petitioner's testimony that he was physically and mentally coerced into giving the confession was "not credible."  (2T 18-21 to 23.)[10]  Furthermore, as the prosecution argued, Petitioner's confession offered a highly specific and unsolicited description of certain events that transpired after the murder;[11] it is implausible to believe the police concocted such a description solely in an effort to coerce Petitioner.  (2T 5-8 to 5-22.)

The trial judge also observed the numerous inconsistencies in Petitioner's testimony, e.g., that he both knew and didn't know Ralph Lee (2T 18-24 to 19-4); that he was both "kidnapped"

---

[10] 2T refers to testimony given on January 18, 1996.

[11] Specifically, Petitioner, in his statement, discussed what he did with various items stolen from the video store, including a VCR.  Upon being asked why the potential purchaser decided not to buy the VCR, Petitioner responded, "Because he looked at me strange, and I looked at the VCR and I saw that their blood was on it.  Then I knew he didn't want to buy it, because there was blood all over it."  (2T 5-14 to 22.)

20

by the police and entered the police car voluntarily (2T 19-5 to
7); and that he both knew and didn't know David Hancock (2T 19-8
to 12).  Such inconsistencies reflect on the "characteristics of
the accused," which this Court is required to examine in
considering the voluntariness of a statement.  Schneckloth, 412
U.S. at 226.  In sum, the trial judge found that under the
"totality of the circumstances," he was satisfied beyond a
reasonable doubt that Petitioner's confession was voluntarily
given.  (2T 20-6 to 20-9.)

Although generally under the AEDPA, the factual
determinations made by a state court "shall be presumed to be
correct," 28 U.S.C. § 2254(e)(1), such a presumption does not
apply to questions of the voluntariness of a confession, since
that is an inquiry with a "uniquely legal dimension."  Thompson
v. Keohane, 516 U.S. 99 (1995); Miller v. Fenton, 474 U.S. 104,
116 (1985).  Accordingly, whether a confession was voluntary is
an "issue of law" that a federal court reviews without deference
to lower courts.  Id.  Nonetheless, given Petitioner's
unsubstantiated allegations of mental and physical coercion, his
highly specific description of events, and the numerous
inconsistencies in his testimony, the Court finds as a matter of
law that Petitioner made his statement voluntarily.  Therefore,
Petitioner's claim that his due process rights were violated on
these grounds must fail.

21

Finally, Petitioner's third due process claim--that his Miranda rights were violated because he was interrogated while in custody and prior to being arrested and read his rights--fails as well.

Miranda warnings are only due when a suspect interrogated by police is "in custody." Thompson, 516 U.S. 99.  Whether a suspect is "in custody" requires a court to make two distinct inquiries: (1) what the circumstances were that surrounded the interrogation; and (2) given those circumstances, whether a reasonable person would have felt at liberty to terminate the interrogation and leave.  Id.  Whether someone is "in custody" depends on the objective circumstances, not on the subjective views of either the person being questioned or the interrogating officers.  Id.

The record indicates that, after being asked to speak with the detectives, Petitioner voluntarily went to the police station and spoke with them about the day the victim was murdered.  (6T 17-4 to 18-25.)  The Court also notes that Petitioner was not handcuffed when he went to the police station (2T 16-11), and he was given food and permission to use the restroom at the police station (2T 19-24 to 20-1).  Furthermore, the trial court found "beyond a reasonable doubt" that during his conversation with the police and prior to being arrested, that Petitioner was "free to leave if he so desired," and that Petitioner did not have his

22

freedom restrained in any significant way. (2T 16-16 to 18.)

After analyzing the circumstances surrounding the confession, and affording no presumptive value to the state court's determination on this issue[12], the Court is satisfied that a reasonable person would have felt free to leave the police station on the day in question.  As such, Petitioner was not "in custody" as that term is defined in Thompson.  At the very least, the state court's determination did not involve an unreasonable application of, nor was it contrary to, Supreme Court precedent. 28 U.S.C. § 2254(d)(1); Matteo, 171 F.3d 877.  Nor did it result in a decision that was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

Because Petitioner was not "in custody" at the time he spoke with the police, no right to receive Miranda warnings attached to those discussions.  Thompson, 516 U.S. 99.  Therefore, Petitioner's due process rights were not violated when he spoke with the police prior to his arrest.  As such, all three of Petitioner's due process claims fail.

3.   Probable Cause Claim

Petitioner also argues that he was improperly arrested because the police did not have probable cause to arrest him, and that as a result, the ensuing confession should have been

---

[12] Thompson held that "in custody" analysis, just like "voluntariness" analysis, is a mixed question of law and fact, qualifying for independent review.  Thompson, 516 U.S. 99.

suppressed.  (Pet'r Supp. Br. at 2.)  This claim is without merit.

Initially, the Court observes that a federal constitutional claim that an arrest made by state authorities was without probable cause must be analyzed under the Fourth Amendment, rather than under the Due Process Clause of the Fourteenth Amendment.  Albright v. Oliver, 510 U.S. 266 (1994), reh'g denied, 510 U.S. 1215 (1994).

Whether or not the police have probable cause to make a warrantless arrest turns on "whether at [the moment the arrest was made] the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed...an offense." Beck v. State of Ohio, 379 U.S. 89, 91 (1964).

The facts here are clear that the detectives had probable cause in arresting Petitioner at the police station.  When detectives initially approached Petitioner on the sidewalk, he saw them coming, slowed his gait, and crossed the street.  (6T 16-3 to 17-3.)[13]  Just as in U.S. v. Valentine, 232 F.3d 350 (3d Cir. 2000), where the defendant's conduct after contact with police was properly factored into the determination of whether officers' suspicion was reasonable, here Petitioner's conduct

---

[13] 6T refers to testimony given on January 30, 1996.

upon observing the police alerted them and created probable cause for them to eventually arrest Petitioner at the station.

Furthermore, after being told that the detectives were going to verify his alibi for the day of the murder, Petitioner became depressed and asked the officers not to do so.  When asked whether he was being truthful, Petitioner replied that he was not. (6T 43-3 to 45-13; 7T 36-2 to 38-4.)[14]  Contrary to Petitioner's argument that such actions do not justify probable cause for his arrest (Pet'r Supp. Br. at 2), on the Beck standard such "facts and circumstances" at the time of the arrest do bear on whether it was objectively reasonable for the police to think that Petitioner had committed an offense.  Beck, 379 U.S. at 81.  Also, the police's confidential informant can be fairly said to have provided "reasonably trustworthy information,"[15] making the police's arrest of Petitioner objectively reasonable.  Id.

Given Petitioner's actions upon observing the police, his responses to questions by the police, and the information provided by an informant, the Court is satisfied, under the standard set forth in Beck, that the police had probable cause to arrest Petitioner.

---

[14] 7T refers to testimony given on January 31, 1996.

[15] The trial judge found Detective Reyes' testimony to be credible that the police received information from an informant that "three certain individuals" were outside of the video store at the time of the commission of the crime.  (2T 16-5 to 10.)

4.   <u>Compulsory Process Claims</u>

Petitioner's final claim is that his Sixth Amendment right to compulsory process for obtaining witnesses in his favor was violated when defense counsel chose not to call Petitioner's mother to testify.[16] (Pet'r Br. at 25.)  This claim is without merit.

Just as the Sixth Amendment guarantees to persons accused of a crime the right to examine witnesses against them, to offer their own testimony, and to be represented by counsel, it also guarantees them the right to present their own witnesses to establish a defense, a right that is a "fundamental element of due process of law."  <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967).  However, the constitutional right to compulsory process for obtaining witnesses on one's behalf is not a blanket guarantee granting defendants the right to call any and all witnesses they desire.

In <u>Washington</u>, the Supreme Court held that a defendant in a state criminal trial was denied his Sixth Amendment compulsory process rights when the state prevented the defendant from

---

[16] The Court notes that the right of an accused to have compulsory process for obtaining witnesses in his behalf is so fundamental to a fair trial that it is subject to due process constraints.  <u>Washington v. Texas</u>, 388 U.S. 14 (1967). Accordingly, the Court will analyze this claim as a Sixth Amendment compulsory process claim, but will also subject the claim to the overarching due process constraints listed in section II-D-2 of this Opinion.

putting on the stand certain individuals whose testimony would have been relevant to the defense. Id. Importantly, however, it was the state, and not the defendant's own counsel, that prevented the witnesses from testifying. In this case, Petitioner's attorney made a strategic choice not to call Petitioner's mother to the stand. Whereas the defendant in Washington was denied the process of presenting witnesses on his behalf, Petitioner here was not denied such process--his counsel considered the possibility, and declined to call Petitioner's mother.

Similarly, U.S. v. Morrison, 535 F.3d 223 (3d Cir. 1976), presents a distinguishable fact pattern from that presented here. In Morrison, the court held that the defendant's compulsory process rights were violated when the prosecutor engaged in an extraneous and intimidating colloquy with a potential witness as to the possibility of a perjury charge if she testified falsely. Id. The colloquy resulted in the potential witness declining to testify, thereby depriving the defendant of his right to compulsory process. Id. Again, the facts here are distinguishable. Petitioner does not assert that anyone took affirmative steps to prevent his mother from being called to the stand. He asserts that he was denied the process of calling his mother to the stand, an assertion that, again, is belied by defense counsel's strategic choice not to call Petitioner's

27

mother.

Finally, it has been held that a defendant's compulsory process rights are not necessarily violated when a witness does not testify, so long as other witnesses are available to give substantially the same testimony. Calloway v. Blackburn, 612 F.2d 201 (5th Cir. 1980). As noted above in Part II-D-1 of this Opinion, Petitioner here had already introduced evidence at trial, via the testimony of William Handley, that Petitioner's clothes had no blood on them. (5T 87-18; see also State v. Eric Kelley, Indictment No. 93-10-1183 at 10 (N.J. Super. Ct. Law Div. Dec 11, 2000)). This is precisely what Petitioner claims his mother would have testified to, had she been put on the stand. (Pet'r Br. at 25.)

Petitioner has failed to show that counsel's decision not to put his mother on the stand has resulted in an "absence of fairness that fatally infected the trial." Lisenba, 314 U.S. at 236. Given the facts in this case, the distinguishable features of the relevant case law, and Petitioner's failure to meet the due process standard, the Court rejects Petitioner's claim that his compulsory process rights to have his mother called to the stand were violated.

28

III. <u>CONCLUSION</u>

For the foregoing reasons, Petitioner's application seeking a writ of habeas corpus is **denied.**  An appropriate order follows.


                                  <u>   /s/ William G. Bassler     </u>
                                    William G. Bassler, U.S.S.D.J.

DATE:      August 30, 2005